John H. Robinson, WSB # 6-2828
Lauretta Y. Welch, WSB #6-4383
Marci Crank Bramlet, WSB #7-5164
ROBINSON STELTING WELCH BRAMLET, LLC
172 Center Street, Suite 202
P.O. Box 3189
Jackson, Wyoming 83001
(307) 733-7703
(307) 201-5546 FAX
john@rsw-law.com
lauretta@rsw-law.com
marci@rsw-law.com
*Attorneys for Plaintiff*

## STATE OF WYOMING

### DISTRICT COURT FOR THE NINTH JUDICIAL DISTRICT – TETON COUNTY

| | |
|---|---|
| LINDA COLUMBUS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 18426 ) |
| WYOMING BALLOON COMPANY, ANDREW BREFFEILH, RICHARD LAWHORN, RICHARD GLAS, JOHN DOE, | ) ) ) ) ) ) |
| Defendants. | ) ) |

### COMPLAINT

COMES NOW Plaintiff, Linda Columbus, by and through her undersigned counsel, and for her causes of action in this matter, alleges as follows:

#### I.   Parties and Jurisdiction

1. Plaintiff Linda Columbus is a resident of the State of Virginia.

2. Defendant Wyoming Balloon Company (hereinafter referred to as "WBC") is a Wyoming close corporation, with its principal place of business in Teton County, Wyoming.

3. Defendant WBC offers balloon tours/transportation services to individuals and groups.

4.  Defendant Andrew Breffeilh (hereinafter referred to as "Breffeilh") is an owner of WBC and was the pilot of one of the WBC balloons that crashed on August 3, 2020.

5.  Breffeilh is a resident of Teton County, Wyoming.

6.  Defendant Richard Lawhorn (hereinafter referred to as "Lawhorn") was the pilot of the WBC balloon in which Plaintiff was a passenger.

7.  Upon information and belief, Lawhorn is a resident of Kentucky.

8.  Defendant Richard Glas (hereinafter referred to as "Glas") was the pilot of one of the WBC balloons that crashed on August 3, 2020.

9.  Upon information and belief, Glas is a resident of Arizona.

10. Upon information and belief, there was a fourth balloon launched by WBC earlier on the morning of August 3, 2020, which landed safely.

11. John Doe (hereinafter referred to as "Doe"), named above, was the pilot of the fourth WBC balloon.

12. Upon information and belief, all pilots are employees and/or independent contractors of WBC.

13. Plaintiff reserves the right to move to amend this Complaint to add any additional parties or entities in contract with WBC, or who are contractually obligated to defend and/or indemnify WBC for causes of action arising out of Defendants' negligence.

14. Plaintiff also reserves the right to amend if evidence or discovery demonstrates a legal relationship between currently named parties which implicate additional or different causes of action.

15. All acts, errors and/or omissions forming the basis of Plaintiff's claims occurred in Teton County, Wyoming.

16. The amount in controversy exceeds the sum of $50,000 and this Court has jurisdiction over this matter.

## II. Facts Supporting Claims

17. Plaintiff restates all previous allegations and incorporates them by this reference.

18. Prior to August 3, 2020, Plaintiff and her partner, Kevin Sidders, made arrangements with WBC for a hot-air balloon ride/tour. The ride/tour was to occur on August 3, 2020, with an arranged "take-off" in the early morning hours near Wilson, Wyoming and Jackson Hole Mountain Resort.

19. The WBC website proclaims their balloon tours are safe, stating:

> "We fly on the lee side of the Tetons, where winds are generally light and marvelously varied. We may have many different winds at different altitudes, which our pilots navigate deftly. Landings can often be so gentle that you don't even know you are on the ground. Because of our light winds and roomy gondolas, we are pleased to accommodate the handicapped and the disabled whenever possible."

20. The WBC website proclaims their pilots are safe, stating:

> "International experience.
>
> Our very experienced commercial pilots have over forty years of ballooning experience, on several continents. All of our pilots and balloons are fully certified by the Federal Aviation Administration.
>
> With the Wyoming Balloon Company, safety is always **first**."

21. According to owner Breffeilh, the standard operating procedure for Defendants prior to balloon flights with passengers was to check weather reports, satellites and radar to make sure no

threatening weather could arise to endanger the passengers, and to do everything possible to ensure the pilots would not be taken by surprise by the weather.

22. According to owner Breffeilh, Defendants' practice is to cancel balloon flights when weather appears to be a threat to the flight or the passengers, and cancellation for such threatening weather conditions occurs often.

23. According to owner Breffeilh, Defendants' standard practice is to cancel a flight if they are doubtful about the conditions.

24. A hot-air balloon, or a "free balloon," is a civil aircraft governed by the Federal Aviation Administration (hereinafter referred to as "FAA") and the Code of Federal Regulations. (hereinafter referred to as "CFR") "Aircraft" means any device that is used or intended to be used for flight in the air. 14 CFR § 1.1.

25. Since 2012 the Rapid Refresh (hereinafter referred to as "RAP") regional weather forecast model of North America has been publicly available, and its use is endorsed by the Balloon Federation of America (hereinafter referred to as "BFA"). RAP provides temperature and wind readings from 0-18,763 ft in altitude for Jackson, Wyoming. BFA's "PRO" division is the nation's leading trade organization for balloon operators, and its publications and safety protocols are endorsed and posted by the FAA to its website. BFA's website affirmatively proclaims that "Accurate weather information is critical to safe balloon flying." The website has nine different weather links available to the public and operators including the National Weather Service radar and storm prediction center and the "Balloonists' Wind Forecast" (link to RAP website).

26. Aircraft operators can contact the FAA/Flight Service Station (hereinafter referred to as "FSS") at any time to request a specialized briefing by providing basic flight plan information or

use FSS resources to access preflight weather information. The National Weather Service National Oceanic and Atmospheric Administration provides the information and identifies the service as the "Pilot's Guide for Aviation Weather."

27. On August 3, 2020 at approximately 6:45 am, Plaintiff met with pilot Richard Lawhorn, other agents and/or independent contractors of WBC, and several other passengers, for the purpose of commencing the hot-air balloon ride/tour.

28. Inclement weather was developing as Defendants were in the field setting up the balloons.

29. Dark clouds were seen to the west on the back side of the Tetons, and it was windy.

30. Despite the weather, the flights were not cancelled.

31. Prior to Lawhorn's balloon ascent with Plaintiff and approximately twelve other passengers, the balloons piloted by Doe, Breffeilh and Glas launched.

32. Lawhorn's balloon did not launch until more than twenty minutes after the balloons piloted by Breffeilh and Glas had launched.

33. Prior to Lawhorn's balloon ascent, no adequate safety warnings were provided to the passengers.

34. Upon information and belief, prior to the launch of the three balloons piloted by Breffeilh, Glas and Lawson, the only safety instruction provided to the passengers was "don't fall out."

35. During the "safety instruction" portion of the pre-launch procedures, Lawhorn explained to the passengers, including Plaintiff, that upon landing they should not get out of the balloon until he told them to. Then, he said "the most important thing is" and pulled the blower so

passenger's couldn't hear what he said. He turned the blower off and laughed. This was the extent of the "safety instruction."

36. At no time before the launch of the balloon did Plaintiff receive any training or instruction from Defendants concerning the dangers associated with ballooning, how to land a balloon in the event of an emergency, how to do so in the midst of a storm, or what to do in the event of pilot incapacity or ejection.

37. At no time before the launch of the balloon did Plaintiff receive any training or instruction from Defendants concerning her responsibility for assisting with safe landing of the balloon in the midst of an emergency.

38. At no time before the launch of the balloon did Plaintiff receive any training or instruction from Defendants concerning her obligation to understand how to land the balloon in the event the pilot was ejected from the balloon.

39. At approximately 7:10 am, Lawhorn's balloon (the one in which Plaintiff was a passenger) was launched.

40. At no time prior to Lawhorn's balloon ascent did anyone with WBC, nor the pilots of the other balloons, provide a warning that the conditions were dangerous for a balloon tour.

41. Passengers on the Lawhorn balloon asked Lawhorn about whether it was safe to launch.

42. Lawhorn advised it was safe.

43. Upon information and belief, passengers in the balloons piloted by Breffeilh and Glas were given the same information, that the balloon tour would be safe, and that conditions did not exist to make it unsafe.

44. At all times pertinent to the facts surrounding Plaintiff's and the other passengers' booking and agreement to take the balloon tours, Plaintiff relied upon the training, experience

6

and expertise of WBC and the other Defendants to recognize dangerous conditions and decline to launch a balloon in conditions which could seriously injure a passenger.

45. At all times pertinent to the facts surrounding Plaintiff's and the other passengers' booking and agreement to take the balloon tours, Plaintiff relied upon the training, experience and expertise of WBC and the other Defendants to provide safety instructions for various conditions that could arise during the flight or landing.

46. At all times pertinent to the facts surrounding Plaintiff's and the other passengers' booking and agreement to take the balloon tours, Plaintiff relied upon the training, experience and expertise of WBC and the other Defendants to institute proper procedure and protocol for the pilot to remain in the balloon at all times during the flight.

47. At all times pertinent to the facts surrounding Plaintiff's and the other passengers' booking and agreement to take the balloon tours, Plaintiff relied upon WBC and its pilots to follow FAA guidelines and federal laws pertaining to hot-air balloon flights.

48. Prior to and after launch, the storm created weather conditions threatening the Lawhorn balloon's flight and the safety of the passengers on the balloon.

49. In fact, upon launch, Lawhorn's balloon clipped some trees.

50. Plaintiff was not an experienced balloon passenger; and, she did not know whether clipping the tops of trees was normal or to be expected.

51. All of the balloons piloted by Breffeilh, Lawhorn and Glas crashed to the ground during flight.

52. As a result of the three crashes, multiple parties were injured – some seriously.

53. The Lawhorn balloon flight was scheduled to last for approximately one hour, including an uneventful landing.

54. Within thirty minutes after launch, the Lawhorn balloon began to descend.

55. During the descent, Lawhorn informed the passengers that the balloon was going to "touch the ground" and told them "don't fall out".

56. The Lawhorn balloon made contact with the ground on three separate occasions after launch, none of which were planned as part of the launch or with the intent to land.

57. When the Lawhorn balloon first made contact with the ground, Lawhorn and WBC were presented with a perfect opportunity to keep the balloon on the ground, or land it shortly thereafter, in the event it was still somewhat airborne, to have Plaintiff and the other passengers depart before any catastrophe or injuries could ensue.

58. In other words, under the conditions present when the balloon first made contact, prudence on behalf of the safety of the passengers dictated a soft and safe landing, and no further flying.

59. To ignore the threats and re-launch the balloon, Defendants' conduct presented a clear and present danger to Plaintiff and the other passengers.

60. To ignore the threats and re-launch the balloon, Defendants ignored their obligation to their passengers.

61. Nevertheless, Lawhorn and WBC "relaunched".

62. After the 'relaunch', the balloon again contacted the ground.

63. During the second such contact, Lawhorn was ejected from the balloon as he was not secured to the balloon and was apparently not aware his balloon was going to make contact with the ground the second time.

64. After he was ejected, Lawhorn's balloon started ascending again, leaving the passengers and Plaintiff in a balloon without a pilot (Lawhorn) on-board.

65. After ejection, Lawhorn yelled to the stranded passengers to "pull the red ropes".

66. Plaintiff was initially unaware of the content of the instructions being yelled but became aware when the balloon was 50-100 ft from the ground.

67. Plaintiff communicated to the other passengers that the pilot was instructing the passengers to pull the red ropes.

68. The passengers found the two red ropes.

69. Plaintiff and passenger Kevin Sidders pulled one of the red ropes, as instructed.

70. The Lawhorn balloon descended rapidly, slammed the ground and hit a fence.

71. Unbeknownst to Plaintiff, the red rope Lawhorn had instructed her to pull had become entangled with one of her legs.

72. Plaintiff, along with the majority of passengers, was ejected, with the red rope wrapped around her leg.

73. The Lawhorn balloon continued to drag for several hundred feet, with Plaintiff being dragged by her leg, repeatedly making injurious contact with the ground, including to her face and head.

74. Subsequently, as the balloon ascended into the air, Plaintiff was pulled by the rope into the air for more than 10 feet, whereupon she untangled herself and fell to the ground.

75. Plaintiff sustained severe injuries.

76. The balloon continued into the air, and ultimately made its final landing, which ejected the remainder of the passengers.

77. Plaintiff's injuries included multiple broken bones, including a fractured clavicle and orbital bone, multiple contusions, abrasions, and lacerations, a severe left-hand injury and a

concussion. She also lost an ear, which was torn from her scalp and subsequently needed to be amputated.

78. As a result of the Defendants' acts, errors, omissions, and/or willful and wanton misconduct Plaintiff has and continues to experience pain, suffering, and emotional distress, disfigurement, loss of enjoyment of life, loss of earnings and economic opportunities, and medical expenses, both past and future.

79. Whenever it is alleged that Defendants breached the standard of care, was negligent, reckless, carelessly or grossly negligent, such actions or omissions were done by them in the scope of duties with WBC, and WBC is vicariously liable for such conduct.

### IV.   Cause of Action - NEGLIGENCE

80. Plaintiff realleges all previously asserted facts and allegations and incorporates them by this reference.

81. At the time Plaintiff embarked on the Lawhorn balloon flight referenced herein, Defendants and their agents owed a duty of reasonable care to Plaintiff.

82. The duty of reasonable care included a duty to recognize dangers which could cause Plaintiff or other passengers harm or injury.

83. That duty of care existed prior to the initial launch of the balloon, and during flight, including at times when the balloon was in contact with, or close to, the ground.

84. The duty of reasonable care included the pilots' duty to exercise ordinary care in the handling of the aircraft, to remain in the aircraft, and to do everything in their power to keep their passengers safe, including declining a takeoff in unsafe conditions.

85. The duty of care also included Defendants' obligations not to intentionally or recklessly ignore the dangers for the passengers.

86. The duty of reasonable care included Defendants' duty to provide Plaintiff with instructions concerning how to respond in the event of an emergency landing, or what to do in the event the pilot was ejected during such an emergency.

87. The duty explained in the previous paragraph included Defendants' obligation not to act willfully or wantonly when it came to Plaintiff's safety, at any time she was their passenger and customer.

88. The Defendants and their agents and employees breached their duties of care to Plaintiff and all Defendants are vicariously and/or directly liable for such negligence.

89. The Defendants and their agents and employees also breached their duty of care not to willfully and/or wantonly disregard their duty of care to Plaintiff.

90. Plaintiff has suffered damages due to the Defendants' negligence, gross negligence, and the negligence and gross negligence of their employees and agents, as previously referenced, and which will be proven at trial.

## IV. Cause of Action – RECKLESSNESS/GROSS NEGLIGENCE

91. Plaintiff realleges all previously asserted facts and allegations and incorporates them by this reference.

92. The acts, errors and omissions and conduct of Defendants were reckless, willful, wanton and reflected their utter disregard for the rights, interests and safety of Plaintiff, and others.

93. As such was just alleged in the preceding paragraph, grounds have been alleged to justify an award of exemplary or punitive damages against all Defendants.

WHEREFORE, Plaintiff prays that the Court award relief to Plaintiff for injuries and harms caused by Defendants' negligence, including but not limited to:

1. An award for economic damages, including past, present and future medical expenses.

2. An award for non-economic damages, including but not limited to, past, present and future pain and suffering and loss of enjoyment of life.

3. An award of exemplary and punitive damages.

4. An award of damages for temporary and permanent disfigurement.

5. An award of costs of bringing this action.

6. An award of attorneys' fees, if the Court deems such to be appropriate.

7. Any other further relief the Court deems just and proper.

RESPECTFULLY SUBMITTED this 31st day of March, 2021.

John H. Robinson, WSB # 6-2828
Lauretta Y. Welch, WSB #6-4383
Marci Crank Bramlet, WSB #7-5164
ROBINSON STELTING WELCH BRAMLET, LLC
172 Center Street, Suite 202
P.O. Box 3189
Jackson, Wyoming 83001
(307) 733-7703
(307) 201-5546 FAX
john@rsw-law.com
lauretta@rsw-law.com
marci@rsw-law.com
*Attorneys for Plaintiffs*